IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KENDALL ROBERTS,**                                    Case No. 4:16 CV 2533

        Plaintiff,                                    Judge Sara Lioi

        v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                                    REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Kendall Roberts ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated October 18, 2016). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in December 2012, alleging a disability onset date of November 18, 1997. (Tr. 238-44).[1] His claims were denied initially and upon reconsideration. (Tr. 162-64, 170-75). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before

---

1. This is Plaintiff's fifth application for SSI. All previous applications were denied at some point at the administrative level and Plaintiff did not appeal those decisions to a district court. (Tr. 80-107); *see also* Tr. 25 (administrative law judge's summary of Plaintiff's prior applications). Plaintiff's most recent application was denied by an administrative law judge on March 31, 2008. *See* Tr. 101.

the ALJ on February 5, 2015. (Tr. 38-79). On March 12, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19-29). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on October 18, 2016. (Doc. 1).

### FACTUAL BACKGROUND

*Personal Background and Testimony*

Plaintiff was born in July 1965; he was 47 years old at the time of his application and 49 at the time of his hearing. *See* Tr. 238. He lived with his mother. (Tr. 61). Plaintiff also had a girlfriend, whom he had been with for ten years. (Tr. 65).

Plaintiff has a high school education, but was a "D and F student". (Tr. 51). He testified he could not read well, and needed help with writing. *Id.* He could, however, do simple math. *Id.* Plaintiff was injured in a fall from a roof in 1997 while working as a roofer. (Tr. 54-55). Plaintiff previously received workers' compensation benefits for his injuries.[2] (Tr. 52).

Plaintiff testified he was unable to drive due to back pain. (Tr. 50). His pain was in his "low back down into [his] groin, clear to [his] right ankle" and he described it as nine out of ten (Tr. 58), and constant (Tr. 52). Plaintiff underwent a fusion and discectomy at L5/S1 in September 2012. (Tr. 55). Plaintiff testified his doctor told him the surgery failed. (Tr. 56-57). He anticipated having a spinal cord stimulator procedure done on his back. (Tr. 52, 57). At the time of the hearing, Plaintiff was taking 30 milligrams of Oxycodone three times per day for his back pain (Tr. 56), but it did not control his pain (Tr. 59). He saw a doctor in a pain clinic. (Tr. 57).

---

2. "I was cut off let's see four months ago would be - - I haven't had anything in four-and-a-half months. They just cut me off waiting to see about disability and I'm having that procedure done on my low back, your honor." (Tr. 52).

Plaintiff estimated he could walk for one to two blocks, and stand for ten to fifteen minutes. (Tr. 59). He testified he could bend forward "[v]ery little" and could not bend his knees and squat. (Tr. 60). He could sit for 10 to 15 minutes before having to move around. *Id.* He testified he could lift 15 pounds, but "like[d] to keep it under 10". *Id.*

Plaintiff also had an ankle fusion in 1997 with pins and screws. (Tr. 55). His ankle makes it feel like he is walking on pins and needles. (Tr. 67). He did not have any ankle procedures since his application date, and did not use any assistive device when walking. (Tr. 56). He did, however, wear a permanent brace on his ankle, which also required special shoes. (Tr. 67).

Plaintiff also testified he had been seeing a mental health provider for approximately five months (Tr. 57-58); and he saw a counselor monthly (Tr. 68). He testified his mental health and depression worsened due to the pain over time. (Tr. 69). Plaintiff took Paxil for depression and anxiety which "helps a little bit". *Id.* Plaintiff testified he had difficulty with memory and concentration. (Tr. 59) ("I can read a paragraph and forget it and if you ask me to read it back to you, five minutes later it's impossible for me.").

Plaintiff testified there were seven steps to get into his house, and he used a railing to get up the stairs. (Tr. 61). He could take care of his personal hygiene and dressing, but it was particularly painful to put his boots on. (Tr. 63). On a typical day, Plaintiff got up, took an Oxycodone, and lay back down. *Id.* Then he would get up, and have coffee and toast. *Id.* During the day he spent most of his time either reclining or lying down, and also walked "a little bit . . . to take a little bit of pressure off." (Tr. 64); *see also* Tr. 67-68 ("getting out or walking a block or two to see a friend, helps me for some reason just to get outside because I'm not able to do anything else."). He could shop "a little bit", but relied on other people to take him to the store, or carry

3

anything heavy. *Id.* Plaintiff's mother was disabled and had a nurse aide who helped with laundry, as did his girlfriend and sister. (Tr. 64-65). He went to church once per year on Easter. (Tr. 65-66).

*Relevant Medical Evidence*[3]

*Physical Impairments*

From December 2009 to April 2010, Plaintiff saw a chiropractor. *See* Tr. 345-76; 367-76; 465-66). Plaintiff also underwent physical therapy in 2009 and 2010 for both his ankle and back. *See* Tr. 475-513; 335-43; 402-16.

In May 2010, Plaintiff underwent ankle surgery to remove two painful screws in his ankle. (Tr. 378-80). A November 2010 ankle MRI revealed arthropathy, synovitis, tendonitis, effusion, and a mild mid-foot stress phenomenon. (Tr. 631). In 2011, Plaintiff was prescribed a brace. *See* Tr. 636. In April 2012, Dr. Lawrence A. DiDomenico wrote a letter stating Plaintiff medically required a pair of soft level tennis shoes to ambulate due to his ankle problems. (Tr. 621).

In July 2012, a lumbar spine MRI showed disc herniation at L5-S1 with a superimposed central and right paraspinal disc extrusion abutting the descending right S1 nerve root, as well as moderate bilateral neural foraminal narrowing at L5-S1. (Tr. 660).

In August 2012, Plaintiff underwent back surgery with Mark R. Grubs, M.D. (Tr. 661-64). He had a lumbar decompression at L5 right and S1 right, a lumbar discectomy at L5-S1, and a transforaminal epidural injection at L4 right. (Tr. 661).

---

3. To prevail in a claim for SSI benefits Plaintiff must establish that he was disabled "on or after [his] application date." *Casey v. Sec'y of Health & Human Servs,* 987 F.2d 1230, 1233 (6th Cir. 1993) ("[t]he proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date"). Here, Plaintiff filed his SSI application on December 19, 2012, and therefore must prove disability after that date. The undersigned therefore primarily focuses on the evidence after that date, but summarizes some earlier evidence to present a complete picture of Plaintiff's medical conditions.

4

At a November 2012 appointment with a chiropractor, Plaintiff reported frequent pain that was nine out of ten in his low back, with radiation to his right leg. (Tr. 688). On examination, Plaintiff had decreased range of motion, and a positive Kemp's test. *Id.*

In January 2013, Plaintiff saw chiropractor Joseph DiDomenico, D.C., FACO, who noted Plaintiff had gone to four or five physical therapy sessions in the past three weeks, but back and right leg pain persisted. (Tr. 767). Plaintiff had normal muscle strength in his legs except some bilateral hip extension and hip flexion weakness, but normal bulk and tone. *Id.* His straight leg raise was 90 degrees in the seated position, and he reported an increase in lower back and right leg pain with a supine straight leg raise at 70 degrees. *Id.* Notes reflect: "[e]xaggeration is positive for sighing, and clutching his back with walking and changing direction." *Id*.

In March 2013, Plaintiff saw Dr. DiDomenico, who noted he had been approved for, and would be scheduled for, physical therapy. (Tr. 778). Plaintiff returned in April complaining of worsening right leg pain and reported he had "not been going to PT" because he had "been hurting too bad". (Tr. 779).

In May 2013, Plaintiff underwent a right transforaminal epidural steroid injection at L5-S1. (Tr. 781-82). At a follow-up appointment with Dr. DiDomenico, he had intact sensation, and normal muscle bulk, tone, and strength in his lower extremities. (Tr. 783). Dr. DiDomenico ordered an MRI, noting no significant improvement after the steroid injections. (Tr. 784). He also noted Plaintiff had positive Kemp's and Stork signs reproducing low back and right leg pain, but Plaintiff's sitting straight leg raise test was negative for lower back and leg pain on both the right and left sides, except right leg pain and left leg tightness. *Id.* His supine straight leg raising was 45 degrees on the right with right leg pain, and 65 degrees on the left without pain. *Id.*

A July 2013 MRI showed: "Degenerative changes at the L5-S1 level with mild broad-based protrusion causing mild bilateral lateral recess narrowing and moderate neuroforaminal narrowing. (Tr. 836). At a visit to Dr. DiDomenico in July, Plaintiff estimated he had "a week of relief, estimated 40-50% improvement" with his steroid injection. (Tr. 785).

In November 2013, neurosurgeon Ashvin T. Ragoowansi, M.D., evaluated Plaintiff for his back and right leg pain. (Tr. 832-35). On examination, Dr. Ragoowansi noted Plaintiff had an antalgic gait, back pain with standing up, limited range of motion in his back due to pain, a positive straight leg raise test on the right (negative on the left), and a normal motor exam ("with difficulty with toe walking secondary to pain"). (Tr. 832). Dr. Ragoowansi reviewed the MRI from July 2013 (Tr. 836-37) and summarized that it showed "degenerative disc disease at L5-S1", "no significant endplate changes at L5-S1", "no significant disc herniation there" and "no nerve root compression to speak of." (Tr. 832). He opined it was "unlikely any surgical intervention could have helped or would help in the future" and that "[t]he only thing that may help is a spinal cord stimulator." (Tr. 832).

From January 2014 through February 2015, Plaintiff saw Shawn M. Donatelli, D.O., at Tiffany Pain Group. (Tr. 902-52). In January 2014, Dr. Donatelli noted Plaintiff complained of pain that was ten out of ten in his lower lumbar region, radiating to the right leg and groin. (Tr. 941). Plaintiff described "severe, unrelenting, burning and aching right-sided low back pain that extends into the right buttock and groin, and is also associated with severe numbness, tingling aching, and stabbing dysesthesia encompassing the entire right lower extremity, extending to the foot." *Id.* Dr. Donatelli also noted Plaintiff had been recently discharged from the practice of "the physician who is managing his chronic pain medications, as he saw a new psychiatrist (Dr. Prasad), who prescribed Soma and Valium to him" and "[t]his was viewed as a violation of his medication

6

contract." *Id.* On examination Dr. Donatelli found "[m]ild to moderate" limitation of range of motion in Plaintiff's lumbar spine, moderate weakness in right hip flexion, and a positive straight leg raising test. (Tr. 944). He noted Plaintiff's left ankle had mild tenderness and swelling, and mild to moderate restriction of range of motion, but no instability, and the alignment was normal. *Id.* Dr. Donatelli concluded he would "most likely resume therapy with analgesics, as more definitive measures are pursued" and that he hoped "with appropriate intervention, his reliance on analgesics and the [sic] reduced, or even eliminated." (Tr. 945). Finally, Dr. Donatelli noted: "Upon discussion, the patient indicates that current treatment results in improved symptom control and ability to perform ADLs." *Id.*

At Plaintiff's next visit, Dr. Donatelli noted Plaintiff stated "that his current analgesic regimen provides him with suboptimal pain relief." (Tr. 937). Dr. Donatelli also noted "[o]n an unrelated matter, he sustained a second degree burn to his right forearm earlier this week while boiling spaghetti. *Id.* Dr. Donatelli noted similar physical findings to Plaintiff's prior visit and refilled his Oxycodone prescription. (Tr. 939). He again noted "the patient indicates that current treatment results in improved symptom control and ability to perform ADLs." *Id.*

Throughout Plaintiff's treatment with Dr. Donatelli, he had tenderness, muscle spasm, and some restriction of range of motion in his lumbar spine; he also had some weakness in right hip flexion, but "otherwise grossly intact" muscle strength in lower extremities, and a positive straight leg raising test on the right. (Tr. 903, 907, 911, 915, 918, 921, 924, 927, 930, 935, 938, 944, 947, 950). Dr. Donatelli also noted Plaintiff's right hip, thigh, ankle, and foot had normal inspection/palpation, range of motion, muscle strength and tone, and stability. (Tr. 903, 907, 911, 915, 918, 921, 924, 927, 930, 935, 938, 944, 947, 950). And Dr. Donatelli continued to refill Plaintiff's Oxycodone prescription. (Tr. 904, 908, 912, 916, 919, 922, 925, 928, 931, 939, 951). In

October 2014, Dr. Donatelli administered epidural steroid injections for Plaintiff's low back pain. (Tr. 879-80). However, Plaintiff reported no significant improvement as a result. *See, e.g.* Tr. 946.

In July 2014, Plaintiff was warned for violating his medication contract by escalating his pain medication without approval. (Tr. 917). Plaintiff reported he did so because he was "having severe low back pain that [was] poorly controlled with his current pain regimen." *Id.* Dr. Donatelli warned him any further infractions would lead to discharge from the practice. *Id.*

Again in November 2014, Dr. Donatelli noted Plaintiff had received a prescription for Percocet, in violation of his medication contract. (Tr. 906, 909). Plaintiff was warned that any further infraction would lead to Plaintiff's discharge. (Tr. 906). At that same visit, Plaintiff reported no significant improvement from the steroid injections, and that his current regimen provided "moderate pain relief", but that his "symptoms have been escalating recently." *Id.* Plaintiff did not want to change his medication routine, or try physical therapy. *Id.* Dr. Donatelli noted:

> It is recognized that the patient is not doing particularly well. However, he is hesitant to pursue other appropriate options, including alternative pharmacotherapy, physical therapy, or more advanced interventional pain management modalities. We will continue to monitor his progress closely. However, unless he develops a more open mind regarding options, it is unlikely that his condition will improve.

(Tr. 909). Dr. Donatelli made similar comments in December 2014, but also noted Plaintiff was "inquisitive about the prospects of a spinal cord stimulator" and agreed to make the necessary arrangements. (Tr. 904). Plaintiff also "continue[d] to deny a medication rotation and [did] not wish to try physical therapy at this point" in January and February 2015. (Tr. 946, 949).

In December 2014, Dr. DiDomenico wrote a letter regarding Plaintiff's workers' compensation case. (Tr. 878). He noted Plaintiff "has had ongoing persistent symptoms involving his lower back radiating into his right leg" which have "failed to improve with surgical

intervention, epidural steroid injections and trial of conservative physical therapy." *Id.* He noted examination showed restricted lumbar spine range of motion, and "positive nerve root tension signs on the right side with weakness of the right lower extremity but intact sensory evaluation." *Id.*

*Mental Impairments*

As part of Plaintiff's workers' compensation case, he underwent several mental health evaluations or assessments. In June 2010, Douglas Darnall, Ph.D., administered testing and assessed depressive disorder. (Tr. 551-54). Dr. Darnall stated Plaintiff could require psychotherapy and continued psychotropic medications. (Tr. 554).

In February 2011, Douglas Crush, Ph.D., noted he submitted a request for twelve psychotherapy sessions and six additional medication management sessions over the next six month period. (Tr. 544-45). Dr. Crush noted there was an evaluation performed by Dr. Darnall that "needs to be considered with extreme caution and probably is invalid" due to "possible indicator[s] of symptom exaggeration." (Tr. 544). Dr. Crush's plan was to initiate psychotherapy services and medication management. *Id.*

In July 2011, Plaintiff returned to Dr. Darnall who noted Plaintiff "continues to suffer severe depression with sleep disturbance, agitation, withdraw, excessive anxiety, recent weight loss, and severe and chronic pain". (Tr. 547). Plaintiff reported he had not followed through with mental health treatment because he could not afford the round trip taxi fare. *Id.*

In August 2013, Plaintiff sought treatment at Northeast Behavioral Health and in October 2013, Plaintiff returned for a single visit. (Tr. 826). At that visit, he reported pain, anxiety and depression. (Tr. 827). Karipineni Prasad, M.D., noted normal speech; organized, relevant, and logical thought process; normal associations; no delusions or hallucinations; no suicidal or

homicidal thoughts; adequate judgment and insight; intact memory decreased attention and concentration; normal language; appropriate affect; and a markedly depressed and anxious mood. *Id.* Dr. Prasad prescribed medication and assigned a GAF score of 52.[4] *Id.* Plaintiff did not return. (Tr. 826).

In October 2014, Plaintiff underwent a diagnostic assessment with Amy S. Frampton, a licensed social worker, at Comprehensive Behavioral Health Associates, Inc. (Tr. 851-69). Plaintiff was "very upset" and "agitated". (Tr. 855). Ms. Frampton suggested medication and therapy. (Tr. 862-64).

Later that month at an initial psychiatric assessment, Plaintiff was well groomed, with average demeanor and eye contact. (Tr. 852). The psychiatrist observed Plaintiff had clear and rapid speech and his activity was agitated. *Id.* Plaintiff's thought process was logical, circumstantial, and racing. *Id.* His mood was anxious and angry, and his behavior was agitated, hyperactive, and restless. (Tr. 853). Plaintiff was prescribed medication, and instructed to follow up in two weeks with Dr. Kuza, and attend therapy once per month with Ms. Frampton. (Tr. 854).

Plaintiff saw Ms. Frampton for counseling in October, November, and December 2014, and February 2015. (Tr. 869, 873-74, 871-72, 877). Additionally, he saw a physician for medication management during this time period. *See* Tr. 870, 875-76. Plaintiff reported feeling anxious and depressed (Tr. 871-74, 877), and Ms. Frampton noted Plaintiff indicated he was not making progress. (Tr. 869, 871, 873).

---

44. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM–IV–TR* at 34.

Dr. Donatelli at Tiffany Pain Group, who saw Plaintiff from January 2014 through February 2015, consistently noted a mostly normal psychiatric evaluation. *See* Tr. 904, 908, 912, 916, 919, 921-22, 924-25, 927-28, 931, 935-36, 938-39, 944, 948, 951.

*Opinion Evidence*

In February 2012, Plaintiff underwent a consultative psychological examination with psychologist David Bousquet, M.Ed. (Tr. 596-603). Mr. Bousquet opined Plaintiff would be able to understand, remember and carry out instruction in a work setting "consistent with other individuals who possess[] borderline intellectual capabilities and functioning." (Tr. 602). He also opined Plaintiff would experience no difficulties maintaining attention, concentration and pace due to his psychological problems, but was "mostly distracted by pain." *Id.* Additionally, Mr. Bousquet opined Plaintiff would have no difficulty with conforming to social expectations in a work setting. *Id.* He opined, however, that Plaintiff would be expected to have "some problems" responding appropriately to work place pressures and stresses. (Tr. 602-03).

In March 2012, Plaintiff underwent an Independent Multiaxial Forensic Psychiatric Examination with Anil Choudary Nalluri, M.D. (Tr. 604-16). Dr. Nalluri noted Plaintiff's attitude was cooperative, his station and gait were normal, and there was no evidence of agitation or hyperactivity in Plaintiff's motor activity. (Tr. 606). His affect was appropriate to his thought content, and his mood was moderately depressed and anxious. (Tr. 606-07). Plaintiff's speech was normal, and his thought process was organized, logical, relevant, and sequential. (Tr. 607). He was, however, preoccupied with his pain, and mental health symptoms. *Id.* Dr. Nalluri found Plaintiff's concentration to be decreased, but his memory (remote, recent past, and recent) was normal. *Id.* His judgment was normal, and his insight and mental capacity were fair. *Id.* There was no evidence of symptom magnification or minimization. *Id.* Dr. Nalluri assessed depressive

11

disorder not otherwise specified and Plaintiff would have moderate limitation of some activities of daily living and some social and interpersonal functioning. (Tr. 608-09).

In March 2013, Plaintiff underwent a consultative psychological examination with Vernon E. Brown, Ph.D. (Tr. 712-19). Plaintiff reported he had walked to the exam. (Tr. 713). Plaintiff denied current mental health treatment, but stated he had seen a psychologist about two years prior. (Tr. 714). Plaintiff initially stated he did not drink alcohol, then later stated he drank "occasionally" and acknowledged past problems with alcohol consumption. *Id.* Dr. Brown noted Plaintiff was pleasant and cooperative, with an appropriate affect, and a somewhat labile mood. (Tr. 715). Plaintiff reported his ability to get along with people "depends" and when he gets angry he does not want to be around people. (Tr. 715-16). Plaintiff also reported both visual and auditory hallucinations. *Id.* Plaintiff described his memory as "[n]ot too good" and getting worse, but Dr. Brown noted his immediate recall was good. (Tr. 717). His ability to concentrate "appeared significantly impaired." *Id.* ("He was only able to complete the first step of serial sevens. He was able to complete six steps of serial threes with one error that was pointed out to him and one error which he self corrected."). Plaintiff reported he is "up and down all day", that he "visits friends and friends come to see him also", and "that he tries to get out some every day." *Id.*

Dr. Brown assessed major depressive disorder, single episode, severe with psychotic features. (Tr. 718). He also assessed borderline intellectual functioning and a GAF score of 40[5].

---

5. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM—V") (noting recommendations "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). A GAF score of 31-40 indicates "indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment

*Id.* In his functional assessment, Dr. Brown concluded: 1) Plaintiff's ability to understand, remember and carry out instructions was "somewhat impaired"; 2) Plaintiff's ability to "perform simple and complex tasks remains intact"; 3) Plaintiff's ability to respond appropriately to supervisors and coworkers would be "significantly impaired by depression and anxiety"; 4) Plaintiff's ability to respond appropriately to pressures in a work setting would be "notably impaired" due to depression with intermittent hallucinations; and 5) Plaintiff had the ability to manage any benefits he may receive. (Tr. 719).

In April 2013, state agency reviewing psychologist Carl Tishler, Ph.D., reviewed Plaintiff's records. (Tr. 130-31, 134-36). Dr. Tishler concluded Plaintiff had moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 130). He noted Plaintiff had no repeated episodes of decompensation. *Id.* In his functional assessment, Dr. Tishler opined Plaintiff had: 1) no limitation in the ability to remember locations and work-like procedures; 2) no significant limitation in the ability to understand and remember, or carry out short and simple instructions; and 3) moderate limitations in the ability to understand and remember or carry out detailed instructions. (Tr. 134). He concluded Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods. *Id.* He found Plaintiff was not significantly limited in the ability to make simple work-related decisions, but was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and the ability to perform at a consistent pace. (Tr. 134-35). With regard to social interactions, Dr. Tishler concluded Plaintiff was moderately

---

in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work, child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM–IV–TR*, at 34.

limited in his ability to interact appropriately with the general public, get along with coworkers or peers, and respond appropriately to instructions and criticisms from supervisors. *Id.* He believed Plaintiff "retain[ed] the ability to interact with the general public, coworkers and supervisors on no more than a superficial basis." (Tr. 135). Dr. Tishler found Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and "retain[ed] the ability to perform in a static work environment that does not require strict production standards." *Id.*

On September 17, 2013, state agency reviewing psychologist Paul Tangeman reviewed Plaintiff's records. (Tr. 148-49, 152-54). Dr. Tangeman concurred with Dr. Tisher's findings, and noted the medical source statement "provide[d] by recent CE examiner is not consistent with the overall findings and not given great weight." (Tr.154).

*VE Testimony*

The ALJ described to the VE a hypothetical individual who could: 1) perform light work; 2) never climb any ladders, ropes, or scaffolds; 3) occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; 4) avoid all hazards; 5) perform only simple unskilled work; 6) occasionally interact with supervisors and co-workers; 6) never interact with the public; 7) work in a low stress work setting with no rapid production quotas or assembly line work; 8) have limited decision-making responsibility; and 9) have few changes in the work setting. (Tr. 74-75). The VE testified that such an individual could perform the jobs of mail clerk, router, or garment sorter. (Tr. 75).

The ALJ then changed the hypothetical to sedentary work, with the same other prior restrictions. (Tr. 75-76). The VE testified such an individual could perform the jobs of document preparer, touchup inspector, or glass waxer. (Tr. 76).

14

The VE also testified that the customary tolerance for absenteeism for any of these jobs was one to two days per month, and tolerance for time spent off-task was ten percent per day. (Tr. 77-78). She also testified that the mail clerk and garment sorter jobs would accommodate a sit stand option. (Tr. 78).

*ALJ Decision*

The ALJ found Plaintiff had not engaged in substantial gainful activity since his application date, and that he had severe impairments of:

> Degenerative disc disease of the lumbar spine, status post microdiscectomy and decompression at LS1; history of left ankle injury/calcaneal fracture; major depressive disorder; anxiety disorder; borderline intellectual functioning; and substance abuse.

(Tr. 21). He found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing, specifically considering Listings within 12.00 and 1.00. (Tr. 22). The ALJ then concluded Plaintiff maintained the residual functional capacity:

> to perform light work as defined in 20 CFR 416.967(b) that: requires no climbing ladders, ropes or scaffolds and no more than occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; avoids all exposure to moving plant machinery and unprotected heights; is limited to simple, routing, unskilled work with no rapid production[] quotas or assembly line work, limited decision making responsibility, and few changes in the routine work setting; and involves no more than occasional interaction with supervisors and coworkers and no interaction with the public.

(Tr. 23). The ALJ found Plaintiff had no past relevant work, and was 47 years old, or a "younger individual" on the date his application was filed. (Tr. 28). The ALJ found Plaintiff had a high school education and could communicate in English. *Id.* The ALJ noted that if Plaintiff had the RFC to perform a full range of light work, a finding of not disabled would be directed by Medical-Vocational Rule 202.20. (Tr. 29). Because Plaintiff could not perform the full range of light work, the ALJ employed the testimony of a VE. *Id.* Relying on the VE's testimony, the ALJ found there

were jobs in significant numbers in the national economy that Plaintiff could perform. *Id.* As a result, the ALJ concluded Plaintiff was not disabled. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

4.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises four challenges to the Commissioner's decision, alleging the ALJ erred in his analysis of: 1) the Listings; 2) Plaintiff's mental impairments; 3) Plaintiff's RFC and the vocational expert testimony; and 4) Plaintiff's testimony.

<u>Listing Analysis</u>

Plaintiff asserts the ALJ erred in failing to find Plaintiff's back impairment met Listing 1.04A and his ankle impairment met Listing 1.06. The Commissioner responds that the ALJ properly evaluated the Listings, and Plaintiff has not met his burden of showing evidence that meets the elements of these Listings. For the reasons discussed below, the undersigned finds the ALJ did not err in this regard.

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir. 1984). Moreover, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

At Step Three of the analysis here, the ALJ stated he had "appropriately evaluated medical and other evidence pertaining to the claimant's medically determinable impairments in conjunction with all the relevant severity criteria contained within 1.00 Musculoskeletal System". (Tr. 22). The ALJ thus did not address either Listing 1.04A or Listing 1.06 explicitly. However, it is only reversible error for an ALJ to fail to address a Listing if Plaintiff can show the record raises a "substantial question" as to whether his impairments met or medically equaled the severity of the listing. *See Smith–Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (citing

18

*Abbott v. Sullivan*¸ 905 F.2d 918, 925 (6th Cir. 1990)); *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant meets a listing requires more than what [Plaintiff] has put forth here, a mere toehold in the record on an essential element of the listing."). "[T]he claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. Thus, in instances where the ALJ does not evaluate a listing, the court must "determine whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each requirement of the listing." *Id.* at 432-33. The claimant "must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433. Thus, the undersigned turns to whether Plaintiff has pointed to record evidence raising a substantial question as to his ability to meet the Listings at issue.

*Listing 1.04A*

Plaintiff argues his low back impairment meets Listing 1.04A. Listing 1.04A provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.04. Plaintiff argues that he has shown consistent positive straight leg raising tests, and sensory loss that he subjectively described as "stabbing dysesthesia encompassing the entire right lower extremity, extending to the foot" in his appointments at Tiffany Pain Group. *See* Tr. 902-52; *see also* Doc. 14, at 1 (Plaintiff's argument

19

that "[s]ensory loss is also evident, described as 'stabbing dysesthesia encompassing the entire right lower extremity extending to the foot.'"). However, on examination, the physician in those same records (Tr. 903, 907, 911, 915, 918, 921, 924, 930, 935, 938, 944, 947, 950), and physicians in others (Tr. 688, 760, 774, 767, 770, 779, 783, 785, 838) repeatedly found full reflexes and sensation on examination. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B) ("The physical examination must include a detailed description of the rheumatological, orthopedic, neurological, and other findings appropriate to the specific impairment being evaluated. These physical findings *must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation."*) (emphasis added); SSR 82–53, 1982 WL 31374, *4 (a medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.").[6]

Because Plaintiff has not shown any sensory or reflex loss, he has not shown the record raises a substantial question as to whether he met the requirements of Listing 1.04A. *See Smith-Johnson*, 579 F. App'x at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.[7]

---

6. For this reason, the argument raised in Plaintiff's Reply brief, that the ALJ "failed to appreciate that the *complaints* of numbness extending from Mr. Roberts' low back into the right buttocks and groin are consistent with the requirements of § 1.04A" and that Plaintiff described "stabbing dysesthesia encompassing the entire right lower extremity extending to the foot" (Doc. 14, at 1-2) (emphasis added), holds no weight. Plaintiff must point to objective findings, not subjective symptom complaints, to establish the requirements of the Listing.

7. Plaintiff argues the Commissioner's citation to *Wilcox v. Astrue*, 2012 WL 3238753 (N.D. Ohio) is distinguishable because "the key element missing from the medical records was the straight leg raise test, and the Court found that without that critical test element, the listing could not be addressed." (Doc. 14, at 1). Regardless of *which* element it is, a claimant has the burden to prove all elements are satisfied. *King*, 742 F.2d at 974; *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a Listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter

*Listing 1.06*

Plaintiff alleges his ankle impairment meets or medically equals the criteria of Listing 1.06.

Listing 1.06 requires a showing that Plaintiff has a:

> Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With:
>
> A.  Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
>
> B.  Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.06. Inability to ambulate effectively is defined as:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 1.00B2b.

> [E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.*

Plaintiff fails to provide any evidentiary support for either of the two requirements of

Listing 1.06. First, he points to no imaging showing there is not a solid union of the bone at the

fracture site. In fact, the most recent image in the record, a November 2010 MRI, notes "[c]omplete

subtalar fusion" and lists as conclusions: arthropathy, tenosynovitis, tendinosis, effusion, and mild

how severely, does not qualify."). Listing 1.04A's requirement that a claimant show "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss", is just as much a requirement as the positive straight leg raising test. And Plaintiff has not presented evidence raising a substantial question as to this element.

mid-foot stress phenomenon. (Tr. 631). Rather, Plaintiff argues generally that his ankle has continued to be symptomatic "despite several surgeries." (Doc. 14, at 2). This is not sufficient to raise a substantial question as to Listing 1.06's requirement of the non-union of a fracture. Second, Plaintiff has not presented evidence of inability to ambulate effectively, as defined by § 1.00B2b. He does not require any assistive devices to ambulate, Tr. 25-26 & 67, and, as the ALJ observed, he walked from his home to a consultative examination in April 2013 (Tr. 56) (citing Tr. 713). Moreover, Plaintiff testified walks "a block or two to see a friend" (Tr. 67) and that he goes to the grocery store ("I can shop a little bit") if he has a friend to help him carry heavy things (Tr. 64). None of this suggests an "extreme limitation of the ability to walk" as required by § 1.00B2b. Plaintiff has therefore not shown the record raises a substantial question as to whether he met the requirements of Listing 1.06. *See Smith-Johnson*, 579 F. App'x at 432. The ALJ's failure to discuss that Listing was therefore not reversible error. *Id.* at 433.

Although Plaintiff very clearly suffers from back and ankle issues, the ALJ here properly found them to be severe impairments (Tr. 21), and considered the limitations therefrom in formulating his RFC (Tr. 23-28).[8] The ALJ did not reversibly err in failing to discuss whether Plaintiff met Listings 1.04A or 1.06.

---

8. Plaintiff generally asserts that "the ALJ's failure to fully evaluate these severe impairments and consider them appropriately in fashioning the RFC in this case has tainted the rest of his decision" (Doc. 10-1, at 10), the RFC "simply does not properly reflect his limitations as a result of his physical and mental impairments and is woefully inaccurate" (Doc. 10-1, at 14), and that "ALJ Mills' hypothetical in this matter, and the RFC upon which it was based do not meet this legal standard. Therefore, the finding of the existence of jobs and no disability premised on it must fail."(Doc. 10-1, at 15). Plaintiff, however, provides nothing more than these conclusory arguments that the RFC is not supported, and then presents specific arguments regarding the Listings and the VE's testimony. As such, the undersigned does not address Plaintiff's underdeveloped RFC argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument

*Mental Impairment*

Plaintiff next asserts the ALJ did not properly evaluate his mental impairments. The Commissioner responds the ALJ did not err. For the reasons discussed below, the undersigned finds no error.

In his argument, Plaintiff argues the records "show that [he] has significant mental health issues which have an impact on his ability to function in the day to day world, let alone complete a work day or work week without interruption by his symptoms." (Doc. 10-1, at 11). After summarizing some of the evidence of record (much of which pre-dates his current SSI application), Plaintiff then concludes the ALJ "failed to properly credit this extensive evidence" and states generally that he is "plainly disabled by these conditions, particularly when considered in concert with his physical condition." (Doc. 10-1, at 14).

Plaintiff did not, however, initially acknowledge that the ALJ here formulated an RFC that included many restrictions related to his mental functioning. The ALJ limited Plaintiff to:

> simple, routine, unskilled work with no rapid production[] quotas or assembly line work, limited decision making responsibility, and few changes in the routine work setting; and . . . no more than occasional interaction with supervisors and coworkers and no interaction with the public.

(Tr. 23). In reply, Plaintiff acknowledges these restrictions, but contends they "do not address the plaintiff's severe mental impairments sufficiently." (Doc. 14, at 3). The ALJ, however, supported this decision with substantial evidence. The ALJ observed that despite his reports of depression, treatment notes from his pain management physician in 2014 and 2015 indicate mostly normal:

---

in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quotation and citation omitted)).

affect and mood, judgment, insight, and memory, with no abnormal or psychotic behaviors. (Tr. 27); *see* Tr. 904, 908, 912, 916, 919, 921-22, 924-25, 927-28, 931, 935-36, 938-39, 944, 948, 951.[9]

The ALJ also evaluated the mental health medical opinions of record as required by the regulations. *See* Tr. 27-28; 20 C.F.R. § 416.927 ("Evaluating opinion evidence"). He summarized Dr. Brown's consultative examination findings but assigned it "less weight" because: 1) it was based partly on Plaintiff's self-report of hallucinations which were denied elsewhere in the record; and 2) his opinion of significant impairment in social functioning was contrary to Plaintiff's own reports of having many friends and a girlfriend, as well as shopping and attending medical appointments "without any difficulties noted". (Tr. 27). These reasons are supported by the record. *See* Tr. 875 ("denies hallucinations"); Tr. 65-68 (testimony about having a girlfriend, going to the grocery store, walking to see friends); Tr. 717 (report to Dr. Brown that he had "many friends" and "[h]e visits friends and friends come to see him also").

The ALJ gave "great weight" to the reviewing physicians, Dr. Tishler and Dr. Tangeman because those opinions were "consistent with [Plaintiff's] lack of emergency room visits or hospitalizations, and examination by treating sources that show no significant deficit in mental functioning." (Tr. 27). Plaintiff's argument that according these opinions great weight is "pure error, particularly in light of the other more extensive medical records" (Doc. 10-1, at 13 n.1), is unavailing. First, it is the ALJ's duty, not any particular physician, to formulate the RFC. *See* 20 C.F.R. § 416.927(d)(2). Second, state agency reviewing physicians are considered experts, and their opinions may, at times, be entitled to greater weight than treating or examining physicians when the opinions are supported by the evidence. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) ("State agency medical consultants are "highly qualified physicians and

---

9. In January and February 2015, Plaintiff's mood was noted to be "anxious" (Tr. 948, 951).

24

psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating ... source.") (first alteration in original) (internal quotation marks omitted). Where a non-examining source "did not review a complete case record, 'we require some indication that the ALJ at least considered these facts before giving greater weight' " to that opinion. *Miller*, 811 F.3d at 834 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)).

Here, the ALJ's opinion reflects that he considered evidence of Plaintiff's mental health treatment after the state agency physicians' opinions. *See* Tr. 27 (summarizing October 2014 initial psychiatric evaluation, reports to therapist in 2014 and 2015, and notes regarding his mental health from Dr. Donatelli in 2014 and 2015). Accordingly, the ALJ considered the opinions of Dr. Tishler and Dr. Tangeman in light of the entire record, and the fact that the ALJ assigned greater weight to these opinions presents no basis for remand. *See Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248 (6th Cir. 2016) (finding no error in giving great weight to an earlier state agency reviewing physician opinion when "the ALJ's own analysis clearly spanned the entire record").

The Commissioner also contends the ALJ properly considered that Plaintiff had little mental health treatment during the relevant time period. (Doc. 12, at 15). Plaintiff contends it was inappropriate for the ALJ to consider the failure to seek consistent treatment without considering the circumstances underlying that failure, such as Plaintiff's borderline intellectual functioning and limited financial circumstances. (Doc. 14, at 3). Having reviewed the ALJ's decision, the undersigned finds the ALJ simply mentioned Plaintiff's minimal treatment in passing, and any error in failing to consider the reasons underlying that failure is harmless at best.

Here, the ALJ reviewed the evidence of record, noted the consistency (or inconsistency) with the record, and formulated an RFC based thereon. This was not error. The ALJ specifically accommodated many of Plaintiff's documented mental health restrictions in the RFC, and his reasoning supporting that RFC is supported by substantial evidence. To the extent Plaintiff alleges he was more limited than found by the ALJ, the undersigned reiterates that even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's mental RFC determination and thus the ALJ did not err.

*Reliance on VE Testimony*

Plaintiff next alleges the ALJ erred in relying on VE testimony. Specifically, he alleges the VE's testimony that Plaintiff could perform the job of mail clerk is not supported and the ALJ should have explicitly discussed testimony regarding allowance of absenteeism and time spent off-task. The Commissioner responds that the ALJ's decision complied with the relevant regulations and is supported by substantial evidence.

Plaintiff first argues the three positions identified by the VE—mail clerk, router, and garment sorter—are "not appropriate" because "it is not clear from the descriptions of any of these positions that they can account for this gentleman's need to change positions on a virtually as needed basis, from sit to stand and to walk around and away from the work station at times." (Doc. 10-1, at 15). Additionally, although Plaintiff contends the ALJ "failed to account for the need for a sit/stand option and to properly assess absenteeism and time off task", the ALJ is only required to include in the RFC those limitations he finds consistent with the record as a whole. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). And, an ALJ is not

required to rely on a VE's response to limitations the ALJ ultimately does not adopt. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 730 (6th Cir. 2013).[10] Although these limitations—a sit/stand option, and absenteeism—were discussed at the hearing, the ALJ did not adopt them in the RFC. Therefore, the ALJ was under no duty to discuss them in his analysis of the VE's testimony. *See Rudd*, 531 F. App'x at 730 ("The ALJ was therefore not required to rely on this non-relevant portion of the VE's testimony.").

Next, Plaintiff seemingly challenges the consistency of the VE's testimony with the Dictionary of Occupational Titles ("DOT") description of the mail clerk job. He contends the mail clerk position had a reasoning level of 3 and mentions the use of machinery, both allegedly at odds with the hypothetical question —and ultimately the RFC—formulated by the ALJ. An ALJ is required to identify and obtain reasonable explanations for any conflicts between the DOT and VE testimony. *See* SSR 00-4p, 2000 WL 1898704. In the Sixth Circuit, this duty is satisfied if the ALJ asks the VE whether her testimony is consistent with the DOT. *See Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 508 (6th Cir. 2013); *see also Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009).

The ALJ has an affirmative responsibility to "inquire, on the record, as to whether or not there is [] inconsistency" between the VE's testimony and the DOT." *Id.* Beyond this initial inquiry, however, the ALJ is under no obligation to further investigate the accuracy of a VE's testimony "especially when the claimant fails to bring any conflict to the attention of the [ALJ]."

---

10. Plaintiff acknowledges that "[a]s the Commissioner notes, the ALJ is not required to rely on limitations that were rejected." (Doc. 14, at 4). He continues, however, that "where those limitations are supported by the record, there should be some rationale provided as to why the ALJ rejected that testimony from the vocational expert if it is not clear from the record." *Id.* Plaintiff provides no citation for such an articulation requirement. Because, as discussed above, the ALJ's RFC enjoyed the support of substantial evidence, there was no error in failing to address this testimony.

*Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009); *see also Beinlich*, 345 F. App'x at 168. Here, the ALJ inquired of the VE whether her testimony was consistent with the DOT, and she testified it was. (Tr. 77). Plaintiff did not challenge this at the hearing. *See Beinlich*, 345 F. App'x at 168-69 ("Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision."). Thus, the ALJ did not err with regard to the mail clerk position.[11]

*Consideration of Plaintiff's Age*

Within her argument about the VE's testimony, Plaintiff alleges the ALJ erred by failing to discuss in his decision that Plaintiff was six months shy of reaching a new age category. The Commissioner responds that the ALJ was not required to provide such a discussion, and under prevailing case law, the ALJ's analysis was supported. Moreover, the Commissioner contends, even if the ALJ had applied the older age category, it would not have resulted in a finding of disability. For the reasons discussed below, the undersigned finds the ALJ did not err.

Social Security regulations provide defined age categories. *See* 20 C.F.R. § 416.963. Importantly, for purposes of this case, Plaintiff was 47 years old at the time of his application, a "younger person" under age 50. 20 C.F.R. § 416.963(c). At the time of his hearing, Plaintiff was less than six months shy of turning 50. *See* Tr. 238 (July 1965 birthday); Tr. 38 (February 2015

---

11. And, even assuming *arguendo* Plaintiff is correct and he could not perform the mail clerk position, the other two jobs identified by the VE—router and garment sorter—constitute the required jobs existing in significant numbers in the national economy (totaling 595,000 jobs nationally, and 639 jobs regionally). *See, e.g., Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157-58 (6th Cir. 2009) (concluding that ALJ's erroneous reliance on one of the jobs identified by a VE was harmless because the expert otherwise identified a significant number of jobs in the national economy that the claimant could perform); *see also Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (concluding that 6,000 jobs nationwide is a significant number).

hearing). At age 50, a claimant falls into the category of: a "person closely approaching advanced age." 20 C.F.R. § 416.963(d). Agency regulations also provide that, in considering age as a vocational factor, the Commissioner "will not apply the age categories mechanically in a borderline situation." 20 C.F.R. § 416.963(b). That is, "If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, [the Commissioner] will consider whether to use the older age category after evaluating the overall impact of all the factors of your case." *Id.* Here, the ALJ noted Plaintiff was a "younger individual" and did not discuss whether Plaintiff's case presented a "borderline" situation as envisioned by the regulations, or discuss the possibility of moving Plaintiff to the "closely approaching advanced age" category. (Tr. 28).

First, Plaintiff's argument that the ALJ erred by making "no mention of his transition" to the older age category fails under the very Sixth Circuit case law he cites. In *Bowie v. Comm'r of Soc. Sec.*, the Sixth Circuit rejected the proposition that there was a "*per se* procedural requirement to address borderline age categorization in every borderline case." 539 F.2d 395, 399 (6th Cir. 2008). "Rather, the regulation merely promises claimants that the Administration will 'consider' veering from the chronological-age default in borderline situations." *Id.* Thus, to the extent Plaintiff contends it was error for the ALJ not to explicitly discuss his age situation, such an objection is without merit.[12]

Second, the regulations provide that an ALJ must only "consider" the use of an older age category in a situation where "using the older age category would result in a determination or decision that you are disabled." 20 C.F.R. § 416.963(b). As the Commissioner correctly points out,

---

12. Somewhat confusingly, for support, Plaintiff cites to "the dissent in *Bowie* . . . [as] particularly instructional on this issue." (Doc. 10-1, at 17 n.5).

this is not the situation here. The ALJ here concluded Plaintiff was capable of a reduced range of light exertional work. Under the Medical-Vocational Guidelines, a claimant in the "closely approaching advanced age" category capable of light work is only disabled if he is "[i]lliterate or unable to communicate in English." 20 C.F.R. Part 404, Subpt. P., App'x 2, § 202.09. A person limited to unskilled light work who has a limited education, but is "at least literate and able to Communicate in English" is not disabled, per the Guidelines. *Id.* § 202.10. The ALJ here found Plaintiff had a high school education and was able to communicate in English. (Tr. 28). He also correctly noted that Plaintiff had "held jobs, and was able to fill out medical forms at a physician's office, which shows any [sic] ability to read, write, and understand questions[.]" (Tr. 277) (citing Tr. 829-31). The record, thus, does not support a finding that Plaintiff is illiterate. Therefore, because using the older age category would not have resulted "in a determination or decision that [Plaintiff was] disabled", 20 C.F.R. § 416.963(b), the ALJ cannot have erred in failing to discuss the older age category. *See Deaton v. Comm'r of Soc. Sec.*, 315 F. App'x 595, 600 (6th Cir. 2009) ("Although Deaton was within a few days of reaching 45, the application of that older age category would not result in a finding of disability, and, therefore, this is not really a borderline situation. This is because the record does not support a conclusion that she is illiterate.").

*Consideration of Plaintiff's Testimony*

Finally, Plaintiff alleges the ALJ erred in his consideration of Plaintiff's subjective symptom statements and testimony. Specifically, he alleges the ALJ took information out of context and used it to discredit Plaintiff's statements and conclude Plaintiff could work. The Commissioner responds that the ALJ properly considered Plaintiff's activities in assessing his subjective reports, and that there was no error. For the reasons discussed below, the undersigned finds no error in the ALJ's credibility analysis.

30

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). The regulations require an ALJ to consider certain factors, including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)[13]; SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR . . . 416.929(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements"). Although the ALJ must "consider" the listed factors, there is no requirement the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

An ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding

---

13. This regulation was amended effective March 26, 2017. However, the undersigned references the prior version of the regulation because the ALJ's decision was issued in March 2015.

that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

Here, the ALJ appropriately explained the two-step process for evaluating subjective statements of symptoms. (Tr. 23-24) (citing 20 C.F.R. § 416.929). He determined Plaintiff's impairments could reasonably be expected to cause his symptoms, but that his statements concerning the "intensity, persistence and limiting effects of these symptoms [were] not entirely credible for the reasons explained in this decision." (Tr. 24). The ALJ further explained:

> [Plaintiff] testified to significantly limited activities of daily living. However, while the claimant testified that others prepare his meals, the record indicated that he was boiling spaghetti, which supports that he does cook [citing Tr. 937]. Also, he did testify that he shops three times a week with a friend and has a girlfriend he spends time with weekly, and he told the consultative examiner that he has many friends that he visits and he tries to go out daily [citing Tr. 717]). He also told his pain management physician that medication improves his ability to perform his activities of daily living [citing Tr. 902-52].. Such statements and activities, absent any objective findings that offer convincing support for his impairment related claims, appear inconsistent with debilitating physical or mental impairments and tend to undermine his credibility as to the frequency and severity of his symptoms and the degree of his functional limitation.

> * * *

> While the claimant reports debilitating pain, the record indicates that during an examination, he was exaggerating his pain [citing Tr.767], and his allegations are inconsistent with objective findings and post-surgery treatment. Imaging of his back shows improvement post-surgery, examinations show 5/5 muscle strength in the upper and lower extremities, intact reflexes and sensation, and normal alignment and no instability in his ankle. Further, the claimant has received proper treatment for his back, does not need an assistive device for ambulation, reports relief form his pain medication regimen, and he has refused to change his medication regimen or try other treatments, which supports any pain is tolerable. As to his ankle, his [sic] has had no treatment since the application date and he was able to walk from his home to the consultative examination, which supports this impairment is not causing debilitating pain or limitation [citing Tr. 713]. Additionally, the claimant reports activities of daily living that appear inconsistent

32

with constant, debilitating pain, such as hanging out with friends, shopping in stores, and going out daily.

(Tr. 24-26). This thorough credibility analysis is supported by the record, and the considerations therein were appropriately evaluated pursuant to 20 C.F.R. § 416.929. Subsection (c)(3)(i) provides that the Commissioner will consider "[y]our daily activities" when evaluating symptoms. *Id.* § 416.929(c)(3)(i). Here, the ALJ considered Plaintiff's daily activities and found they contradicted his allegations of completely disabling pain. The ALJ cited these inconsistencies as a factor in his credibility analysis, and this as not error. *See Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) ("[T]he ALJ did not give undue consideration to [plaintiff's] ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether [plaintiff's] testimony was credible.").

Moreover, the undersigned finds, after careful review, that contrary to Plaintiff's assertion, the ALJ did not mischaracterize, or take his statements out of context. *See* Tr. 64 ("Well we would go to the grocery store, I don't know, three times a week at least. Go when other people is going because we don't - - neither one of us drive."); Tr. 67-68 ("[G]etting out or walking a block or two to see a friend, helps me for some reason just to get outside because I'm not able to do anything else."); Tr. 717 ("He reported he tries to get out some every day"; and "He visits friends and friends come to see him also."). Similarly, while Plaintiff calls it a "gross extrapolation" for the ALJ to note that the fact Plaintiff boiled spaghetti undermined his claim that he did not cook, the undersigned disagrees. Boiling spaghetti is cooking. Therefore, evidence that Plaintiff was cooking during the relevant time period undermines Plaintiff's testimony that he did not cook. *See* Tr. 24 (citing Tr. 937).

The ALJ also appropriately considered Plaintiff's statement to Dr. Donatelli that his medication improved his ability to perform activities of daily living (Tr. 24) (citing Tr. 902-52);

*see* Tr. 906 ("He states his current analgesic regimen provides moderate pain relief"); Tr. 926 (Plaintiff "reports that he derives satisfactory pain relief with his current analgesic regimen."); Tr. 939 ("Upon discussion, the patient indicates that that current treatment results in improved symptom control and ability to perform ADLs."); Tr. 945 ("[T]he patient indicates that current treatment results in improved symptom control and ability to perform ADLs."). *See* 20 C.F.R. § 416.929(c)(3)(iv) (Commissioner will consider "[t]he type, dosage, effectiveness, and side effects of any medication you take").

In analyzing the credibility of Plaintiff's statements, the ALJ also considered the objective findings in the record, a statement from a physician that Plaintiff was exaggerating his symptoms (Tr. 25) (citing Tr. 767), and violations of contracts with his pain management physicians (Tr. 24) (citing Tr. 906, 917). These reasons were supported by the record, and are appropriate considerations in evaluating credibility. *See Lacy v. Comm'r of Soc. Sec.*, 2017 WL 4512584, at *4 (E.D. Tenn.) ("Exaggeration and symptom magnification weigh against credibility."); *Hayes v. Astrue*, 2011 WL 1188510, at *7 (E.D. Tenn.) (finding the ALJ did not err in citing evidence of drug seeking behavior when the issue "was relevant and abundantly supported by substantial evidence of record.").

Finally, Plaintiff objects to the ALJ's finding that "he has refused to change his medication regimen or try other treatments, which supports any pain is tolerable." (Tr. 25-26). Plaintiff contends this was an "improper assessment of the evidence" because: 1) "his initial injury was work related; the record shows that so much of his treatment had to be directed and orchestrated through that process"; 2) Dr. Ragoowansi indicated further surgery would not be an option; and 3) he had tried many types of treatment. (Doc. 10-1, at 18). There is evidence in the record to support the ALJ's finding, however. *See* Tr. 906 (November 2014 note that Plaintiff "does not wish to

34

change his current analgesic regimen" and "does not wish to try physical therapy at this point", and that he "has declined this option [of evaluation "for the prospect of neurostimulation"]"); Tr. 909 (November 2014 note that Plaintiff "is hesitant to pursue other appropriate options, including alternate pharmacotherapy, physical therapy, or more advanced interventional pain management modalities" and that "unless he develops a more open mind regarding options, it is unlikely that his condition will improve."); Tr. 946 (February 2015: "He continues to deny a medication rotation and does not wish to try physical therapy at this point."); Tr. 949 (January 2015: same).

The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [a claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. Having reviewed the ALJ's opinion and the record as noted above, the undersigned finds that the ALJ's explanations as a whole are reasonable and supported by the record. As such, the ALJ did not err in his analysis of Plaintiff's statements.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

       s/James R. Knepp II
       United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).